A proposed alteration in the capital formation of the defendant banking association has occasioned the present litigation.
It will be recalled that previous to 1933 our National Bank Act empowered national banks to issue only common stock, and any subsequently desired increase in that single class of stock could only be achieved by means of the favorable vote of shareholders owning two-thirds of the existing shares. In 1933 the economic casualty with its devastating effect upon the stability of our financial institutions actuated the Congress to implant in our National Bank Act sections 51-a and 51-b which, inter alia, afforded national banks the privilege to issue preferred stock. Those sections prescribed the method by which preferred stock might be issued and the incidents of its ownership, and nevertheless preserved in accordance with the established policy the supervisory powers of the Comptroller of the Currency.
In 1934 it became imperative for the defendant bank to avail itself of the opportunities conferred by the federal legislation, and it resolved to issue preferred stock of two classes to be distinguished and identified as "A" and "B." At that critical period the capital stock of the institution consisted of 40,000 shares of common stock of a par value of $50 a share.
A provident economy of words obliges me to summarize the account of the pertinent subsequent events relative to the processes of recapitalization and to the cognate alterations in the articles of association.
By virtue of the amendment of July 31st, 1934, the capital structure of the bank was increased to $5,200,000 comprised of the following classes of stock:
(a) $2,000,000 Class "A" preferred stock, divided into 200,000 shares of par value of $10 each, which stock was retirable at $10 a share.
(b) $1,200,000 of preferred stock "B," divided into 60,000 shares of par value of $20 each, retirable at $20 a share.
(c) $2,000,000 of common stock, divided into 40,000 shares of par value of $50 each. *Page 391 
The Reconstruction Finance Corporation purchased the $2,000,000 issuance of the Class A preferred stock, and it may be stated with substantial accuracy that the Class B preferred stock was acquired by the directors of the bank.
It will be informative to quote some excerpts and otherwise tersely disclose the import of certain terms and provisions embodied in the amendment of July 31st, 1934.
Article Fourth, section 11:
"By the affirmative vote of the holders, voting by classes, of at least two-thirds of the shares of each class of stock at the time outstanding, and not otherwise, and subject to such approval by the Comptroller of the Currency and such other conditions as at the time may be required by law * * *." (Italics mine.)
It was also provided:
(a) That the capital stock of the Association might be increased provided that
1. No vote of "A" stock was required in order to issue "B" stock or common stock if the proceeds of such issue were to be used to retire "A";
2. No vote of "B" stock was required to issue common stock if the proceeds were to be used to retire "A" or "B" stock;
3. No vote of the holders of stock of any class was required to issue common stock as a stock dividend.
(b) The capital stock could be decreased provided that no vote of any class was required to retire "A" or "B."
(c) The name of the Association might be changed, c.
(d) "These Articles of Association may be amended at any time, and from time to time, in any other respect, but not so as tochange the respective voting rights of the preferred stock `A,'preferred stock `B,' and common stock so long as any shares ofpreferred stock `A' or preferred stock `B' remain outstanding."
(Italics mine.)
Sections 13 and 14 of Article Fourth display the protective sovereignty which the R.F.C. might exercise over the management of the bank in the event that the bank is guilty of delinquencies or violations of the articles. See, also, subdivision (h) section 11, article 4. *Page 392 
In 1935 it was determined that the capital anatomy of the bank continued to be infirm, and consequently on August 23d 1935, the articles of association were again amended to enable the R.F.C. to purchase an additional $3,000,000 of Class A preferred stock. It is to be noticed that in this transformation the par value of the 40,000 shares of the common stock was reduced from $50 to $10 a share. The following recapitalization thereby resulted:
(a) $5,000,000 of Class "A" preferred, divided into 500,000 shares of $10 par, retirable at $10 a share.
(b) $1,200,000 of preferred "B," divided into 60,000 shares of $20 par, retirable at $20 a share.
(c) $400,000 consisting of 40,000 shares of common stock of $10 a share par.
It is not evident that the voting rights and powers of the shareholders of the respective classes of stock under the prior amendment of July 31st, 1934, were in any material or significant respect changed or abridged by the last mentioned amendment.
The capital configuration was next remodeled on October 25th, 1935, at which time the R.F.C. advanced an additional $500,000 for the purchase of 50,000 more shares of Class A stock. The par values of the "A" and "B" preferred stocks were lowered (section 51, b-1, National Bank Act) thus producing the following conformation:
(a) $2,200,000 par value class "A" preferred stock, divided into 550,000 shares of par value of $4 a share, retirable at $10 per share.
(b) $600,000 of preferred stock "B," divided into 60,000 shares, with a par value of $10, retirable at $20 per share.
(c) $400,000 of common stock, consisting of 40,000 shares with a par value of $10 a share.
If one views these successive transitions retrospectively, it is in the amendments of October 25th, 1935, that the cradle of the present discord can be found. An innovation then contorted section 11, Article Fourth of the former articles of association relating to the increase or decrease of stock by the elimination therefrom of the restrictive method of class voting and the substitution of the method exemplified by the following quotation: *Page 393 
"Section 11. Increase or decrease of capital stock; amendmentsof Articles of Association, etc. — By not less than two-thirds of the votes to which all stockholders are at the time entitled, and not otherwise, and subject to the approval of the Comptroller of the Currency and to such other conditions as at the time may be required by law;
"(a) The capital stock of the Association may be increased at any time, and from time to time, through issuing additional shares of preferred stock A, preferred stock B, and/or common stock, and/or through the creation of one or more additional classes of stock * * *."
In our present galloping way of life, it is not unnatural to allow the anxiety, the anguish, and the distress of the period of the economic prostration to fade into a mere fable. Yet in undertaking to estimate the proprieties of the business policies necessarily employed during that intense emergency, we must not forget that today is not yesterday. At that time rescue could only be acquired at the cost of extreme sacrifices, and so it is not evident that the owners of the common stock asserted any opposition to the modification of their voting powers until the introduction in January, 1947, of the proposed plan for a new issue of stock. Indeed, that circumstance gathers increased significance in that I do not recall any proof that the complainants were stockholders at the time of the amendment of the articles of association in 1935. Vide, Bookman v. R.J.Reynolds Tobacco Co., 138 N.J. Eq. 312 (at p. 394);48 Atl. Rep. 2d 646. R.S. 14:3-16, N.J.S.A.
However, I resume the narrative of events. Under date of December 11th, 1946, the president of the bank pursuant to the instructions of the board of directors dispatched a letter to the stockholders from which I transcribe the following excerpts:
"Your Board has given most careful consideration to the report of its committee and it now proposes that you give approval to the issuance and sale of 40,000 new shares of Common Capital Stock, par value of $10 per share, at a net price of $30 per share, for the purpose of retiring all of the Class `B' Preferred Stock outstanding. Your Board is of the opinion that your bank is now in a favorable position for this undertaking. It is also of the opinion that all of Class `B' Preferred Stock and a substantial part of Class `A' Preferred Stock, by the use of the $1,300,000 reserve set up for that purpose, as above referred to, should be retired at this time, rather than the retirement *Page 394 
of Class `A' Preferred Stock alone. It is convinced that a sounder capital structure will result in carrying out this proposed adjustment and that such action is in the best interests of the common shareholders. This proposal is formally presented to you in the accompanying notice of the annual meeting of the shareholders of the bank to be held on January 14th, 1947. The proposed adjustment in the capital structure resulting from the sale of the new Common Stock is in keeping with the wishes of the Comptroller of the Currency of the United States and has his approval.
 * * * * * * * *
"In view of the offering price of the new Common Stock your Board believes that it will be an attractive investment to present shareholders. It expresses the hope that all present Common shareholders will avail themselves of their privilege to take up their full subscription rights for the new Common Capital Stock and continue their full interest in the progress and further growth of their bank. Under the Articles of Association, any shares of the new issue of Common Stock not subscribed for by the Common shareholders or the transferees of their subscription warrants must be offered to the holders of Preferred Stock at the offering price of $30 per share. If there should be any shares left after this offering, such remainder may be sold by the Board of Directors at not less than the offering price of $30 per share.
"As a service to Common shareholders who may desire it in connection with the purchase of their allotment of new Common Stock, your bank has arranged with the Pennsylvania Company of Philadelphia to extend credit for two or three years, as may be desired, at a rate of three per cent per annum. The complete details of these arrangements and all necessary assistance in establishing such credit will be given to any shareholder desiring it at his request."
At a meeting of the stockholders of the defendant bank held on January 14th, 1947, a resolution was presented and declared to be adopted, from which the following quotations of immediate pertinency are extracted:
"RESOLVED FIRST, That, effective upon the valid adoption of this resolution by the shareholders of this Association, the Articles of Association of this Association be amended by striking out the last sentence of Section 8 of Article FOURTH and by inserting in place thereof the following:
"`So long as any shares of preferred stock "A" are outstanding, the Association shall not call or purchase for retirement any shares of preferred stock "B" without the unanimous consent of the holders of the then outstanding shares of preferred stock "A."'
"RESOLVED SECOND, That, under the provisions of Section 5142 of the United States Revised Statutes, as amended, and effective upon the issuance of an appropriate certificate of approval of the Comptroller *Page 395 
of the Currency, the outstanding common stock of this Association, amounting to $400,000 and divided into 40,000 shares of the par value of $10 each, be increased in the sum of $400,000 by the issuance and sale of 40,000 additional shares of such stock of the par value of $10 per share at the sale price of $30 each, making the total amount of common stock of this Association $800,000 which shall be divided into 80,000 shares of the par value of $10 each; that the common shareholders of this Association be accorded such preemptive rights to purchase said additional shares of common stock as are set forth in the Articles of Association of this Association; that the shares thereafter remaining, if any, be offered to the holders of preferred stock `B'; and that any shares remaining thereafter be sold to persons to be designated by a special committee of three directors of the association.
"RESOLVED THIRD, That, upon the issuance of the certificate of the Comptroller of the Currency approving the above mentioned increase of common stock and upon receipt by this Association of specific instructions from the Comptroller of the Currency, the necessary steps be taken by this Association under the then applicable provisions of the Articles of Association of this Association to complete the retirement and cancellation of the outstanding $600,000 aggregate par value of preferred stock `B' of the Association at a retirement price of $1,200,000 plus an amount equal to all unpaid accrued dividends thereon.
"RESOLVED FOURTH, That effective upon the completion of the aforesaid capital changes the Articles of Association of this Association, as amended, be further amended so as to read, in their entirety, as follows:" (Amended articles of association are annexed to the resolution at this point.)
A reproduction here of the duly authenticated report of the meeting of January 14th, 1947, is informative and expository of the action of the shareholders of the respective classes of stock.
"At a Annual meeting of the shareholders of THE FIRST-MECHANICS NATIONAL BANK OF TRENTON, Trenton, New Jersey, held on January 14 , 19 47 , thirty days' notice of the proposed business having been given by ____ mail, all of the foregoing resolutions were adopted by the affirmative vote of50.03 per cent of the total number of shares of common stock outstanding and one hundred per cent of the total number of shares of preferred stock `A' outstanding, and 95.94 per cent of the total number of shares of preferred stock `B' outstanding, the vote on the said resolutions being as follows:
"Total number of shares of preferred
 stock `A' outstanding 350,000
 *Page 396 
"Total number of shares of preferred
 stock `A' represented at the meeting 350,000
"Total number of shares of preferred
 stock `A' voted in favor of the
 resolutions and amendments 350,000
"Total number of shares of preferred
 stock `A' voted against the
 resolutions and amendments none 
"Total number of shares of preferred
 stock `B' outstanding 60,000
"Total number of shares of preferred
 stock `B' represented at the meeting 57,568
"Total number of shares of preferred stock
 `B' voted in favor of the
 resolutions and amendments 57,568
"Total number of shares of preferred stock
 `B' voted against the resolutions
 and amendments none 
"Total number of shares of common
 stock outstanding 40,000
"Total number of shares of common stock
 represented at the meeting 33,344
"Total number of shares of common stock
 voted in favor of the resolutions
 and amendments 20,015
"Total number of shares of common stock voted
 against the resolutions and amendments 13,329

"I hereby certify that this is a true and correct report (a) of the number of days' notice given by ____ mail of the meeting of shareholders of this bank held on the date above-mentioned, (b) of the resolutions adopted at the said meeting and (c) of the total number of shares represented at the said meeting and of the total number of shares voted for and against the said resolutions.
"I do further certify (a) that a complete list of the shareholders voting upon the said resolutions and the number of shares voted by each is on file with the bank, (b) that voting permits were obtained from the Board of Governors of the Federal Reserve System by such holding company affiliates of this bank as voted at the said meeting the stock of this bank owned by such holding company affiliates, (c) that no shares of stock of this bank owned by this bank were voted at the said meeting, (d) that no shares of stock held by this bank as co-trustee were voted at the said meeting by this bank and (e) that no director, other officer or employee acted as proxy at the said meeting."
The aggressive attack upon the challenged validity and equitable propriety of the recapitalization plan is pursued on three cardinal points which are summarily expressed in the brief of counsel for the complainants: *Page 397 
"1. The resolution submitted to the shareholders' meeting of January 14, 1947 (Ex. C-10 Resolved second) received less than a 2/3 vote of the common stock as required by the Articles of Association of defendant bank and therefore did not pass despite the declaration of the Chairman of the meeting that the resolution did pass.
"2. The defendant directors have engineered and fostered a scheme to acquire for themselves, at the expense of the common shareholders and of the bank, part of the assets of the bank without paying adequate compensation therefor and that such action constitutes a fraud and a breach of trust on the part of directors.
"3. The defendant directors have neglected their duty under the Articles of Association, to retire preferred stock A to the damage of the bank and the common shareholders."
I can assure the parties and their counsel that I have studiously examined and considered the pleadings, proofs, the several briefs, and the numerous exhibits in their relation to all of the principal and subsidiary issues but despite the advantages of such a panoramic view, there is a characteristic feature of this cause that lingers conspicuously in my mind and which seems to me to be essentially predominant, inescapable, and decisive in effect.
I will speak of it now. It must be realized that national banks are the creatures of the federal government and that the Congress possesses the superior power to regulate and control their operations and functions. McCulloch v. Maryland, 4 Wheat.
(U.S.) 316; 4 L.Ed. 579; Osborn v. Bank of United States, 9Wheat. (U.S.) 738; 6 L.Ed. 204.
The Congress ordained that there should be in the Department of the United States Treasury a bureau whose chief officer shall be called the Comptroller of the Currency, upon whom the Congress has conferred broad and widespread powers and duties in the administration of the national banking laws. Indeed a fleeting glance at the statutes (Title 12, U.S.C.A.) is convincing of the dignity of his powers and the importance of his numerous duties in the national field of banking and currency. Significantly some of the powers delegated to the Comptroller are judicial in nature, have *Page 398 
been so regarded and sustained by authoritative decisions too numerous to require citation here.
It must next be observed that Congress has definitely empowered the Comptroller to determine in the exercise of hisquasi-judicial capacity the propriety and expediency of the endeavor of a national bank to increase its capital stock.12 U.S.C.A. 51-a, 57. The acts of Congress provide that no increase in capital "shall be valid until" the Comptroller has issued his certificate "specifying the amount of such increase in capital stock and his approval thereof, and that it has been duly paid in as part of the capital of such association." (Emphasis mine.) Delano v. Butler, 118 U.S. 634; 7 S.Ct. 39;30 L.Ed. 260; Winters v. Armstrong, 37 Fed. Rep. 508.
In the present case the Comptroller has not issued his certificate of approval. Before or without his approval, the acts of the stockholders in the matter comprise nothing more than proposals and propositions devised among the shareholders themselves. The plan has not progressed beyond a rudimentary state.
The Comptroller disapproved of prior proposals submitted to him. In expressing his preliminary approval of the submission of the present program to the stockholders, the Comptroller in his letter of January 7th, 1947, definitely forewarned the president of the bank that his initial sanction would be subject to the issuance of a certificate of his final approval.
The following paragraphs of his communication are also noticeably relevant:
"Your attention is called to the provisions of the articles of association relating to preemptive rights to purchase new shares of common stock, to the effect that any new shares which are not subscribed for by holders of common stock `shall be offered for subscription to the holders of record of all other shares of stock of all other classes at the time outstanding in proportion to the number of such shares held by them respectively.' Under this provision, the shares not subscribed for should be offered to the holders of preferred `A' and preferred `B' in the proportions required by the provision quoted.
"The disposition of the new shares which are not subscribed for by either (a) the holders of common stock or (b) the holders of preferred `A' and preferred `B' stock is governed by the last sentence of *Page 399 
the preemptive rights section of the articles of association. None of such shares, of course, are to be sold for less than the price at which they are being offered to present shareholders.
"In at least one case, a national bank has disposed of such unsubscribed shares by inviting all stockholders and the public to make sealed offers for any number of shares up to the total available, at not less than the preemptive purchase price (in this case $30 per share), such sealed bids being opened publicly at a time and place fixed in advance, and the available shares sold to the highest bidder, the second highest, and so on, until all were disposed of. The premium (above the `preemption' price) was distributed pro rata to the common shareholders who failed to exercise their subscription warrants.
"Such a plan has the advantage of obtaining a higher average price for the unsubscribed shares than might otherwise be obtained, and in addition, it gives the benefit of the value of their unexercised warrants to the common shareholders who failed — because of ignorance or financial inability — to exercise or sell their preemptive rights. You may wish to give consideration to a plan along these lines, adapted to the special circumstances of this situation."
It would be manifestly audacious for this court in the absence of any enlightenment on the subject to presuppose that the Comptroller will resolve to certify his approval of the present plan. If such a forecast were to be improvised, ought this court even as a matter of policy interpose to deter the Comptroller from first performing his duty? Incidentally, the Comptroller is not a party to this cause against whom any injunctive order can be granted. Moreover the object of the proposed increase in the capital stock is to acquire funds with which to retire preferred stock. Basically the undertaking in that regard is essentially an administrative matter appropriately placed under the supervision of the Comptroller.
Counsel for the complainants evidently entertain the conviction that this court in the circumstances of the case has concurrent authority to approve or disapprove the proposed recapitalization. The complainants as well as all other present owners of common stock are accorded by the resolutions preemptive rights to purchase all of the new common stock, but so far as I am aware, such warrants have not yet been issued and circulated. To what extent the common shareholders will absorb the new stock issue is at the moment unknown.
The equitable complexion of this cause of action is sought to be reflected by the allegation that the directors, as fiduciaries, *Page 400 
having afforded themselves as holders of class B preferred stock, the opportunity to acquire at the stated price the balance of the new stock remaining unsubscribed by the present holders of common stock, will thereby through their own malfeasance achieve a private and personal profit. But here again it is cognizable that for the present, and until approved by the Comptroller, the entire project has no validity. However probable it may seem, the apprehension that if so approved the directors will acquire a large portion of the new stock is at the moment only a prognostication.
The complainants are apprehensive of the conclusiveness of the determination of the Comptroller and its freedom from collateral attack. Assuredly a rapturous and zealous effort by this court to supplant and supersede the primary authority of the Comptroller is neither fitting nor warranted.
A controversy of this frame and nature distinctly resides in the domain of federal supervision and magistracy. Power or not, this court should not prematurely intrude.
I shall advise a decree dismissing the bill of complaint.